**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

**CASE NO.:**

SHARRIF K. FLOYD, individually and as assignee of
THE ANDREWS INSTITUTE AMBULATORY
SURGERY CENTER, LLC,

      *Plaintiff*,

v.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY, TDC SPECIALTY
INSURANCE COMPANY, USI INSURANCE
SERVICES LLC, and MARSH USA INC.,

      *Defendants*.

_____/

## COMPLAINT FOR DECLARATORY RELIEF OR DAMAGES

    Sharrif K. Floyd, individually and as assignee of The Andrews Institute Ambulatory Surgery Center, LLC, sues Endurance American Specialty Insurance Company, TDC Specialty Insurance Company, USI Insurance Services LLC, and Marsh USA Inc., and as grounds states:

### NATURE OF ACTION, JURISDICTION, AND VENUE

    1.    The dispute arises out of professional liability insurance claims resulting from a permanent injury suffered by Mr. Floyd, a top-ranked NFL defensive lineman, at the outset of his career. At its core, the issue is whether the $27 million in coverage for which Andrews Institute paid a premium existed to respond to Mr. Floyd's claim. The insurance companies that issued the operative policies have taken positions resulting in only $17 million in coverage being available to respond to Mr. Floyd's claim, leaving a $10 million shortfall. Mr. Floyd, as assignee of Andrews Institute, seeks a determination that Mr. Floyd's claim is covered under one of two insurance

policies for which the insurance companies have disclaimed coverage or, in the alternative, if no coverage is found, a judgment for damages against Andrews Institute's brokers USI and Marsh holding them accountable for the shortfall in coverage.

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.00, exclusive of attorney's fees, interest, and costs.

3.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 2201 and 2202, as an actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties, and because this action seeks a declaration of the rights, duties, and obligations arising under the insurance policies Endurance and TDC issued to Andrews Institute.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because all the events giving rise to this action occurred in Florida. The Policies were issued and delivered in Florida, and the surgery giving rise to the professional liability insurance claims occurred in Florida.

## PARTIES

5.     At all material times, Mr. Floyd was a citizen of and domiciled in Gainesville, Florida, and is otherwise *sui juris*.

6.     Upon information and belief, Endurance is a Delaware corporation with its principal place of business in Purchase, NY. At all material times, Endurance was licensed to engage in and actively engaged in the business of selling insurance in the State of Florida.

7.     Upon information and belief, TDC is a District of Columbia corporation with its principal place of business in Napa, California. At all material times, TDC was licensed to engage in and actively engaged in the business of selling insurance in the State of Florida.

2

8.      Upon information and belief, USI is a Delaware corporation with its principal place of business in Valhalla, NY. At all material times, USI was licensed to engage in and actively engaged in the business of providing services as an insurance consultant and broker in the State of Florida.

9.      Upon information and belief, Marsh is a Delaware corporation with its principal place of business in New York, NY. At all material times, Marsh was licensed to engage in and actively engaged in the business of providing services as an insurance consultant and broker in the State of Florida.

## GENERAL ALLEGATIONS

### *Events Giving Rise to The Underlying Claim*

10.      On September 22, 2016, Mr. Floyd—a first-round pick in the 2013 NFL draft and one of the top-ranked defensive linemen in the NFL according to numerous scouts and the scouting website Pro Football Focus—underwent surgery for a right knee arthroscopy at Andrews Institute. That surgery effectively ended his career.

11.      Andrews Institute, a surgical center that routinely operates on elite professional athletes, paid premiums for $27 million in healthcare professional liability insurance to cover claims arising from circumstances like Mr. Floyd's.

### *2016-2017 Insurance Policies*

12.      <u>2016-2017 Arch Policy for $2 Million:</u> Arch Specialty Insurance Company ("Arch")—which is not a party because it accepted the claim and paid its coverage limits—issued to Andrews Institute a Healthcare Professional Liability Coverage Policy, Policy No. FLP0054437-03 with effective dates of April 15, 2016 to April 15, 2017 (the "Arch Primary

Policy"). The Arch Primary Policy provided liability coverage limits of $2 million per medical incident. A copy of the Arch Primary Policy is attached as Exhibit A.

13.     <u>2016-2017 Endurance Policy for $25 Million:</u> Endurance issued a Healthcare "Umbrella" Liability Policy, Policy No. HLC10006856901 with effective dates of April 15, 2016 to April 15, 2017 (the "2016-2017 Endurance Policy"). The 2016-2017 Endurance Policy listed Andrews Institute in the Named Insured Extension Endorsement and provided coverage of $25 million per occurrence or medical incident, with an aggregate limit of $25 million for all occurrences and medical incidents. A copy of the 2016-2017 Endurance Policy is attached as Exhibit B.

14.     Despite its incorrect designation as an "umbrella" policy, the language of the 2016-2017 Endurance Policy makes clear it is a follow-form excess policy. Specifically, the Policy includes a broad insuring agreement that ties it to the Underlying Insurance and uses language distinguishing it as a follow-form excess policy:

> "[T]his Policy shall indemnify you in accordance with the same warranties, terms, conditions, exclusions and limitations as are contained in the Underlying Policy(ies) set forth in the Schedule of Underlying Insurance . . . . The insurance provided by this Policy *will not be broader* than the insurance coverage provided by the Underlying Policy(ies)."

Exhibit B at HLC 0201 1208, p. 1 (emphasis added). An endorsement that changes the insuring agreement from an occurrence to a claims-made agreement "*in excess of* the Applicable Underlying Insurance" further confirms the Policy is an excess policy. *Id.* at HLC 1001 0606, Endorsement No. 6 (emphasis added).

15.     The 2016-2017 Endurance Policy's Schedule of Underlying Policies identifies the various policies over which the Endurance Policy is excess. The Underlying Insurance covering Andrews Institute is identified as "Arch Specialty Insurance Company Policy No.: FLP0054437-03, Policy Period: April 15, 2016 to April 15, 2017." Exhibit B at HLC 0102 1606, p. 1.

16.     The 2016-2017 Endurance Policy's Named Insured Extension Endorsement recognizes a retroactive date of January 8, 2005 "For Excess Coverage" as to Andrews Institute. Exhibit B at HLC 0103 1208, p. 2.

17.     The 2016-2017 Endurance Policy defines the terms appearing in bold font in the Policy. "Claim" is not bolded, and it is not defined.

18.     The underlying Arch Primary Policy, whose terms are adopted into the 2016-2017 Endurance Policy, permits coverage for a "medical incident" that occurs on or after the retroactive date and results in a "claim" during the policy period. Exhibit A at 02 HPL0002 00 02 07, pp. 1–2. The term "claim" is defined by Arch to include "any circumstance which is likely to result in a demand for damages, or 'suit.'" *Id.* at 02 PL0002 00 02 07, p. 11.

19.     <u>Reporting Requirements Under the Policies:</u> The Arch Primary Policy required a claim to be first made and reported to Arch in writing during the policy period or extended reporting period. Exhibit A at 02 HPL0002 00 02 07, p. 2. A claim is considered "first made" under the policy when an insured "knew about or should reasonably have known a circumstance was likely to result in a 'claim.'" *Id.* at 02 HPL0002 00 02 07, p. 2.

20.     Similarly, the 2016-2017 Endurance Policy provides that a claim is considered "first made" when an insured becomes aware and gives notice of "specific circumstances involving a particular person which may result in a loss, claim or suit." Exhibit B at HLC 0201 1208, p. 31.

21.     <u>The Brokers' Roles in Procuring the Policies:</u> USI procured the Arch Primary Policy. Marsh procured the 2016-2017 Endurance Policy.

### *2017-2018 Insurance Policies*

22.     <u>2017-2018 TDC Primary Policy for $2 Million:</u> TDC issued to Andrews Institute a Medical Facilities Professional Liability Policy, Policy No. MFP-00084-17-00 with effective dates

of April 15, 2017 to April 15, 2018 (the "TDC Primary Policy"). The TDC Primary Policy provided coverage of $2 million for each professional liability claim, with an aggregate limit of $4 million for all such claims. A copy of the TDC Primary Policy is attached as Exhibit C.

23.     2017-2018 Endurance Policy for $15 Million: Endurance issued a Healthcare "Umbrella" Liability Policy, Policy No. HLC10006856902 with effective dates of April 15, 2017 to April 15, 2018 (the "2017-2018 Endurance Policy"). The 2017-2018 Endurance Policy listed Andrews Institute in the Named Insured Extension Endorsement and provided $15 million in coverage for each occurrence or medical incident, with an aggregate limit of $15 million for all such claims paid by the policy. A copy of the 2017-2018 Endurance Policy is attached as Exhibit D.

24.     Like the 2016-2017 Endurance Policy, the 2017-2018 Endurance Policy is a follow-form excess policy. It includes the same broad insuring agreement that ties it to the Underlying Insurance and again uses language distinguishing it as a follow-form excess policy:

> "[T]his Policy shall indemnify you in accordance with the same warranties, terms, conditions, exclusions and limitations as are contained in the Underlying Policy(ies) set forth in the Schedule of Underlying Insurance . . . . The insurance provided by this Policy *will not be broader* than the insurance coverage provided by the Underlying Policy(ies)."

Exhibit D at HLC 0201 1208, p. 1 (emphasis added). The endorsement to the General Liability coverage, which changes the insuring agreement from an occurrence to a claims-made agreement "*in excess of* the Applicable Underlying Insurance," further confirms the Policy is an excess policy. *Id.* at HLC 1001 0606, Endorsement No. 8 (emphasis added).

25.     2017-2018 TDC Follow Form Excess Policy for $10 Million: TDC issued a Follow Form Excess Policy, Policy No. HPX-00016-17-00 with effective dates of April 15, 2017 to April 15, 2018 (the "2017-2018 TDC Follow Form Excess Policy"). The 2017-2018 TDC Follow Form Excess Policy listed Andrews Institute in the Schedule of Underlying Insurance Endorsement and

provided $10 million in coverage for each claim, with an aggregate limit of $10 million for all claims paid under the policy. A copy of the 2017-2018 TDC Follow Form Excess Policy is attached as Exhibit E.

26.    The 2017-2018 TDC Follow Form Excess Policy's insuring agreement states that TDC "will pay on behalf of the insured … any loss, damages, judgments, settlements, and defense costs in excess of the total limits of liability for **<u>all</u> applicable underlying insurance** which an insured is legally obligated to pay as a result of a covered claim." Exhibit E at HXF-000001-08-16, p. 1 (emphasis added).

27.    Item 4 in the Declarations (titled "Underlying Insurance") advises the reader to "[s]ee Endorsement No. 1 – Schedule of Underlying Insurance[.]" *Id.* at HXD-000001-10-16, p. 1. Endorsement No. 1 lists the Endurance American Specialty Insurance Company Policy Number HLC10006856902. *Id.* at HXE-000010-09-16, p. 3.

28.    Endorsement No. 4 to the 2017-2018 TDC Follow Form Excess Policy further ties the 2017-2018 TDC Follow Form Excess Policy to the 2017-2018 Endurance Policy: "it is understood and agreed that this Policy will apply in conformance with, and will follow the form of, the following endorsement(s) to the following underlying insurance: . . . Endurance American Specialty Insurance Company [policy number] HLC10006856902." Exhibit E at HXE-000021-01-17.

29.    <u>The Brokers' Roles in Procuring the Policies:</u> Marsh procured the 2017-2018 Endurance Policy and both the TDC Primary Policy and the 2017-2018 TDC Follow Form Excess Policy. Although Marsh was the placing broker for the policies, USI also negotiated and secured insurance quotes, provided policy options to Andrews Institute, and was involved in the process

of selecting and placing the 2017-2018 policies, and Andrews Institute sent binding confirmations of its policy selections to both Marsh and USI.

30.     Together, these three 2017-2018 policies were purchased to provide $27 million in coverage, including $2 million in primary coverage by TDC, $15 million in excess coverage by Endurance, and $10 million in excess coverage by TDC.

### USI's Fiduciary Duties to Andrews Institute

31.     USI contracted to procure insurance and also to provide specific claim management services. A copy of the USI Contract is attached as Exhibit F.

32.     USI contractually agreed to negotiate coverage terms, premiums, and the placement of coverage with insurers.

33.     USI also contractually agreed to assist with claims submission interpretation of insurance policies, and during the period between 2016 and 2018 USI handled claims reporting for all policies, regardless of which broker placed the coverage.

34.     USI further contracted to "promptly notify the **affected** insurance companies" of "all material changes in exposure and all changes in loss-related information." Exhibit F at ¶ 12 (emphasis added). The contract provides, without any exclusions or limiting language, that USI "shall" do these things. *Id.*

35.     USI had a contractual obligation to make sure that Andrews Institute's primary and excess healthcare professional liability policies were fully integrated and, because of the nature of the claims-made coverage, that full towers of coverage were preserved.

36.     USI had both contractual and common law fiduciary duties to Andrews Institute arising out of its contract with Andrews Institute.

*Marsh's Fiduciary Duties to Andrews Institute*

37.     Marsh contracted to procure insurance and to provide risk management consulting services. A copy of the Marsh Contract is attached as Exhibit G.

38.     Among the services Marsh agreed to provide were to assist in assessing risk and developing insurance specifications and to recommend potential insurers.

39.     Marsh agreed to review the policies for conformity with the negotiated and agreed terms and coverages.

40.     Marsh also agreed to evaluate coverage availability under the policies and to prepare loss notices to the insurers.

41.     The Marsh Contract specified that "Marsh will not be responsible for the adequacy or effectiveness of any insurance programs or policies implemented by another broker, or any acts or omissions of such broker occurring prior to Marsh's engagement." Exhibit G at ¶ 8.

42.     Marsh placed the 2016-2017 Endurance Policy, the 2017-2018 Endurance Policy, and both the TDC Primary Policy and the 2017-2018 TDC Follow Form Excess Policy.

43.     Marsh had a contractual obligation to make sure that Andrews Institute's primary and excess healthcare professional liability policies were fully integrated and, because of the nature of the claims-made coverage, that there would be no gaps in coverage.

44.     Marsh had contractual and common law fiduciary duties to Andrews Institute arising out of its contract with Andrews Institute.

*Mr. Floyd's Claim*

45.     <u>Reporting the Claim:</u> On April 7, 2017—before the expiration of the Arch Primary Policy and the 2016-2017 Endurance Policy—Andrews Institute notified USI of a new claim based on a national newspaper article published on March 30. The article reported that, due to complications from knee surgery in September 2016, Mr. Floyd's quadriceps was not firing and

his career was in jeopardy. The notification to USI, which attached the article, reported the basis for the claim as "[r]ight knee Meniscus tear meniscectomy with nerve block performed. Potential quadricept (*sic*) injury."

46.    USI notified Arch of Mr. Floyd's claim the same day but did not recognize or acknowledge that Mr. Floyd's injury met the definition of a claim under the Arch Primary Policy. In an email dated April 7, 2017, USI stated, "Acord for notice only. No claim, incident could give rise to a claim. No direct notice from patient or attorney[.]"

47.    The Acord Notice attached to the email was a "General Liability Notice of Occurrence/Claim" (despite this being a professional liability claim under the policy) and provided a "Description of Occurrence" as follows: "No claim has been presented but an article in a national newspaper on March 31, 2017 stated first round NFL player had surgery in September (See attached Description of Occurrence page." The attached page continued "and his quad was not firing. His surgery was a right knee meniscus tear with a nerve block performed. Claim is being reported for report purposes only." A copy of the email and Acord Notice USI sent to Arch are attached as Exhibit H.

48.    USI did not notify Endurance of the claim on that date or at any time prior to the expiration of the 2016-2017 Endurance Policy.

49.    By letter dated April 10, 2017, Arch acknowledged receipt of Mr. Floyd's injury as a claim, but USI still did not notify Endurance.

50.    On April 11, 2017—also before the expiration of the Arch Primary Policy and the 2016-2017 Endurance Policy—in anticipation of changing insurance carriers, Andrews Institute internally confirmed that Mr. Floyd's claim had been reported to Arch and asked whether the

administrator knew of "any other potential claims, complaints, incidents that might give rise to a claim that we should err on side of caution & report[.]"

51.     On the same day, manifesting its desire to ensure full coverage would be maintained from one policy year to the next, Andrews Institute internally stated, "We should be laundry listing these claims as we are changing carriers. Your threshold of what to report should be very low so we are sure to catch everything."

52.     On April 13, 2017, Andrews Institute sought help from USI and Marsh in completing its application for insurance coverage through TDC. Specifically, Andrews Institute asked, "should we provide claim information that has already been reported to Arch Specialty within the last 5 years[?]"

53.     The same day, Marsh responded and advised that, "they are asking if there is an incident or matter that you are already aware of that could give rise to a claim under the new TDC policy. *Given the claims made reporting features and policy language, any known items should be reported to **Arch** immediately as that is where coverage should fall*." (emphasis added).

54.     On December 21, 2017, Mr. Floyd's counsel sent a letter to Andrews Institute and the doctors involved with Mr. Floyd's surgery with a demand of $70 million (the "December 2017 Demand Letter").

55.     On January 8, 2018, Andrews Institute forwarded the December 2017 Demand Letter to USI and asked them to report the claim to the excess carriers, as a claim for this matter had already been opened by Arch under the Arch Primary Policy.

56.     On January 10, 2018, USI submitted the December 2017 Demand Letter to TDC.

57.     On or around January 10, 2018, USI submitted the December 2017 Demand Letter to Endurance for the first time.

58.     On January 12, 2018, TDC acknowledged receipt of the claim.

59.     On March 9, 2018, Endurance acknowledged receipt of the claim.

60.     On November 6, 2018, Mr. Floyd filed a medical malpractice suit against Andrews Institute and others in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida.

61.     On April 15, 2020, Mr. Floyd filed an amended complaint for medical malpractice against Andrews Institute and others in the Circuit Court of the First Judicial Circuit in and for Santa Rosa County, Florida.

### *The Insurance Companies' Positions*

62.     Arch Accepted Coverage and Tendered Its Policy Limits: By letter dated December 9, 2019, Arch accepted coverage for Mr. Floyd's claim and offered its $2 million limits to protect Andrews Institute under the Arch Primary Policy.

63.     Endurance Accepted Coverage Under Its 2017-2018 Policy But Denied Coverage Under Its 2016-2017 Policy: Endurance accepted coverage under the 2017-2018 Endurance Policy (with its $15 million limits) and denied coverage under the 2016-2017 Endurance Policy (with its $25 million limits).

64.     TDC Declined Coverage: By letter dated March 26, 2020, TDC denied coverage for Mr. Floyd's claim under the TDC Primary Policy. Then, by letter dated August 17, 2022, TDC denied coverage for Mr. Floyd's claim under the 2017-2018 TDC Follow Form Excess Policy.

65.     In support of both coverage denials, TDC claimed that Mr. Floyd's claim is not covered under the TDC Primary Policy because notice was provided in the 2016-2017 period to Arch and Arch had accepted the claim.

66.     TDC further claimed that Mr. Floyd's claim is not covered by its excess policy because TDC's primary policy does not cover the claim, and the TDC excess policy is only triggered if its primary layer covers a claim.

67.     TDC's position is that because Arch is agreeing to provide coverage at the primary layer (thereby relieving TDC of the expense and obligation to do so), TDC can avoid providing the $10 million layer of excess coverage for which it was paid a premium.

68.     All necessary parties will appear before the Court in this action.

69.     Each of the Policies constitutes an enforceable contract under Florida law, and all conditions precedent to enforcing the Policies have occurred, been performed, or were waived.

70.     The USI Contract and the Marsh Contract constitute enforceable contracts under Florida law, and all conditions precedent to bringing this action have occurred, been performed, or were waived.

71.     Mr. Floyd retained undersigned counsel to represent his interests in this matter and agreed to pay a reasonable fee for services rendered.

### COUNT I: DECLARATORY JUDGMENT AS TO ENDURANCE

72.     Mr. Floyd re-alleges Paragraphs 1 through 71.

73.     An ongoing and justiciable dispute exists among the parties concerning whether the 2016-2017 Endurance Policy, with its $25 million coverage limits, applies to Mr. Floyd's claim.

74.     Endurance contends that the 2016-2017 Endurance Policy does not cover Mr. Floyd's claim because the policy only covers claims actually made against the insured, not the possibility of a claim in the future.

75.     As detailed above, the 2016-2017 Endurance Policy is a follow-form excess policy that follows the terms of the Arch Primary Policy, and Arch accepted coverage and paid its $2

million limits in coverage to Andrews Institute. The 2016-2017 Endurance Policy does not have a definition of the term "claim"; it instead follows form on the Arch Policy that defines "claim" to include potential claims.

76.     The 2016-2017 Endurance Policy thus recognizes that a claim exists when an insured becomes aware of "specific circumstances involving a particular person which may result in a loss, claim or suit."

77.     Notice of Mr. Floyd's injury on April 7, 2017 was a claim under the 2016-2017 Endurance Policy, triggering coverage and a duty to indemnify up to the policy's limits.

78.     Mr. Floyd requests declarations that:

    (a)     The 2016-2017 Endurance Policy, and its $25 million in coverage limits, applies to Mr. Floyd's claim; and

    (b)     The Court reserves jurisdiction to determine Mr. Floyd's entitlement to and amount of an award of attorneys' fees and costs pursuant to Fla. Stat. §626.9373, costs and interest, and all other relief that this Court deems just and appropriate.

WHEREFORE, Mr. Floyd requests that this Court grant the stated declaratory relief, award attorney's fees and costs pursuant to Fla. Stat. §626.9373, and grant any further relief this Court deems equitable, just, and proper.

## COUNT II: DECLARATORY JUDGMENT AS TO TDC
## (PLED IN THE ALTERNATIVE TO COUNT I)

79.     Mr. Floyd re-alleges Paragraphs 1 through 71.

80.     An ongoing and justiciable dispute exists among the parties concerning whether the 2017-2018 TDC Follow Form Excess Policy, and its $10 million in coverage limits, applies to Mr. Floyd's claim.

81.     Andrews Institute paid TDC a premium to obtain $10 million in coverage in excess of the coverage offered through its primary and underlying excess professional liability policies.

82.     The 2017-2018 TDC Follow Form Excess Policy obligated TDC to provide coverage for "any loss, damages, judgments, settlements, and defense costs in excess of the total limits of liability for **all applicable underlying insurance**."

83.     The 2017-2018 Endurance Policy is one of the underlying insurance policies enumerated by the 2017-2018 TDC Follow Form Excess Policy.

84.     Thus, if the 2017-2018 Endurance Policy covers Mr. Floyd's claim, the 2017-2018 TDC Follow Form Excess Policy also covers it.

85.     Mr. Floyd requests declarations that:

    (a)     The 2017-2018 TDC Follow Form Excess Policy, and its $10 million in coverage limits, applies to Mr. Floyd's claim; and

    (b)     The Court reserves jurisdiction to determine Mr. Floyd's entitlement to and amount of an award of attorneys' fees and costs pursuant to Fla. Stat. §627.428, costs and interest, and all other relief that this Court deems just and appropriate.

WHEREFORE, Mr. Floyd requests that this Court grant the stated declaratory relief, award attorney's fees and costs pursuant to Fla. Stat. §627.428, and grant any further relief this Court deems equitable, just, and proper.

## COUNT III: BREACH OF CONTRACT AGAINST USI
## (PLED IN THE ALTERNATIVE TO COUNTS I & II)

86.     Mr. Floyd re-alleges Paragraphs 1 through 71.

87.     <u>Enforceable contract:</u> At all material times, USI served as one of Andrews Institute's brokers pursuant to a contract executed by the parties.

88.   <u>Duty:</u> USI contractually agreed to "promptly notify the **affected** insurance companies" of "all material changes in exposure and all changes in loss-related information."

89.   Andrews Institute reasonably relied on USI to perform these contractual duties.

90.   <u>Breach:</u> If there is no coverage for Mr. Floyd's claim under the 2016-2017 Endurance Policy, then USI breached the contract by failing to put Endurance on notice of the claim and failing to use the requisite professional skills to secure coverage under the 2016-2017 Endurance Policy.

91.   <u>Damages:</u> As a direct, foreseeable, and proximate result of USI's breach of its obligations under the contract, Mr. Floyd suffered and continues to suffer damages.

WHEREFORE, Mr. Floyd requests judgment against USI for damages, including pre- and post-judgment interest, and any further relief this Court deems equitable, just, and proper.

## COUNT IV: BREACH OF FIDUCIARY DUTY AGAINST USI<br>(PLED IN THE ALTERNATIVE TO COUNTS I & II)

92.   Mr. Floyd re-alleges Paragraphs 1 through 71.

93.   <u>Duty:</u> At all material times, USI served as one of Andrews Institute's brokers. As a broker, USI provided various services, including but not limited to negotiating coverage terms, premiums, and the placement of coverage with insurers on Andrews Institute's behalf; and interpreting the placed insurance policies for purposes of claims submission, regardless of who placed the policy.

94.   USI represented to Andrews Institute that it had the specialized knowledge and expertise necessary to interpret and understand the risks faced by Andrews Institute, to determine the insurance products and insurers best suited to its needs, and to interpret the applicability and notification requirements of the placed insurance policies to specific claims.

95.     As Andrews Institute's broker, USI assumed fiduciary duties to Andrews Institute, including the duty to exercise its specialized knowledge and expertise to ensure Andrews Institute secured appropriate coverage and the duty to advise Andrews Institute of all material facts concerning the coverage.

96.     Andrews Institute reasonably relied on USI to ensure its primary and excess healthcare professional liability policies were fully integrated and the full tower of coverage was maintained from one year to the next, as well as to advise them of any potential coverage issues.

97.     USI knew of Mr. Floyd's claim before the 2017-2018 Policies were placed.

98.     <u>Breach:</u> If there is no coverage for Mr. Floyd's claim under the 2016-2017 Endurance Policy or under the 2017-2018 TDC Follow Form Excess Policy, then USI breached its fiduciary duties to Andrews Institute by failing to ensure Andrews Institute secured appropriate coverage to cover Mr. Floyd's claim and failing to advise Andrews Institute of the gap in coverage.

99.     USI further breached its fiduciary duties by failing to explain the ramifications of providing notice only to the primary insurer and not all insurers in the coverage tower mere days before the end of the 2016-2017 policy year.

100.    <u>Damages:</u> Despite payment of premiums by Andrews Institute for $27 million in coverage, the full tower of coverage is not available to Andrews Institute. As a direct, foreseeable, and proximate result of USI's breach of its fiduciary obligations, Mr. Floyd suffered and continues to suffer damages.

WHEREFORE, Mr. Floyd requests judgment against USI for damages, including pre- and post-judgment interest, and any further relief this Court deems equitable, just, and proper.

## <u>COUNT V: NEGLIGENCE AGAINST USI</u><br><u>(PLED IN THE ALTERNATIVE TO COUNTS I & II)</u>

101.    Mr. Floyd re-alleges Paragraphs 1 through 71.

102.     <u>Duty:</u> As Andrews Institute's broker, USI owed Andrews Institute a duty of care and a duty to exercise reasonable skill and diligence in ensuring Andrews Institute procured appropriate insurance coverage, in interpreting the applicability and notification requirements of the placed insurance policies to specific claims, and in advising Andrews Institute of all material facts concerning the coverage.

103.     Andrews Institute reasonably relied on USI to ensure its primary and excess healthcare professional liability policies were fully integrated and the full tower of coverage was maintained from one year to the next, as well as to advise them of any potential coverage issues.

104.     USI knew of Mr. Floyd's claim before the 2017-2018 Policies were placed.

105.     <u>Breach:</u> If there is no coverage for Mr. Floyd's claim under the 2016-2017 Endurance Policy or under the 2017-2018 TDC Follow Form Excess Policy, then USI breached its duties to Andrews Institute by negligently failing to ensure Andrews Institute secured appropriate coverage to cover Mr. Floyd's claim and negligently failing to advise Andrews Institute of the gap in coverage.

106.     <u>Damages:</u> Despite payment of premiums by Andrews Institute for $27 million in coverage, the full tower of coverage is not available to Andrews Institute. As a direct, foreseeable, and proximate result of USI's negligence, Mr. Floyd suffered and continues to suffer damages.

WHEREFORE, Mr. Floyd requests judgment against USI for damages, including pre- and post-judgment interest, and any further relief this Court deems equitable, just, and proper.

### COUNT VI: BREACH OF CONTRACT AGAINST MARSH (PLED IN THE ALTERNATIVE TO COUNTS I & II)

107.     Mr. Floyd re-alleges Paragraphs 1 through 71.

108.     <u>Enforceable contract:</u> At all material times, Marsh served as one of Andrews Institute's brokers pursuant to a contract executed by the parties.

109.   <u>Duty:</u> Marsh contractually agreed to assess Andrews Institute's risks, develop insurance specifications, and recommend potential insurers; review its placed policies for conformity with the negotiated and agreed terms and coverages; and evaluate coverage availability under its placed policies.

110.   Marsh had a contractual obligation to Andrews Institute to make sure that its primary and excess healthcare professional liability policies were fully integrated and, because of the nature of the claims-made coverage, that there would be no gaps in coverage.

111.   Marsh was also contractually obligated to counsel Andrews Institute on the claims-made nature of the liability coverage it placed and to inform Andrews Institute that, to preserve coverage under a tower, all insurers needed to be notified.

112.   Marsh placed the 2016-2017 Endurance Policy, the 2017-2018 Endurance Policy, and both the TDC Primary Policy and the 2017-2018 TDC Follow Form Excess Policy, so it was contractually obligated to perform its contractual duties for each of these policies.

113.   Andrews Institute reasonably relied on Marsh to perform these contractual duties.

114.   <u>Breach:</u> If there is no coverage for Mr. Floyd's claim under the 2016-2017 Endurance Policy or under the 2017-2018 TDC Follow Form Excess Policy, then Marsh breached the contract by failing to evaluate coverage availability under the 2016-2017 Endurance Policy, failing to advise Andrews Institute that Endurance should be notified of Mr. Floyd's claim prior to the expiration of the 2016-2017 policy year in order to preserve coverage, and/or failing to use the requisite professional skills to secure coverage for Mr. Floyd's claim under the 2017-2018 TDC Follow Form Excess Policy, if it determined coverage would not be available under the 2016-2017 Endurance Policy.

115.   <u>Damages:</u> As a direct, foreseeable, and proximate result of Marsh's breach of its obligations under the contract, Mr. Floyd suffered and continues to suffer damages.

WHEREFORE, Mr. Floyd requests judgment against Marsh for damages, including pre- and post-judgment interest, and any further relief this Court deems equitable, just, and proper.

## COUNT VII: BREACH OF FIDUCIARY DUTY AGAINST MARSH
### (PLED IN THE ALTERNATIVE TO COUNTS I & II)

116.   Mr. Floyd re-alleges Paragraphs 1 through 71.

117.   <u>Duty:</u> At all material times, Marsh served as one of Andrews Institute's brokers. As a broker, Marsh provided various services, including but not limited to assisting Andrews Institute in assessing their risks and developing insurance specifications, advising and counseling Andrews Institute on its purchase of insurance policies, negotiating coverage terms and premiums, placing coverage with insurers on Andrews Institute's behalf, and evaluating coverage applicability on all policies placed by Marsh.

118.   Marsh represented to Andrews Institute that it had the specialized knowledge and expertise necessary to interpret and understand the risks faced by Andrews Institute, to determine the insurance products and insurers best suited to its needs, and to evaluate whether policies placed by Marsh would cover specific claims.

119.   As Andrews Institute's broker, Marsh assumed fiduciary duties to Andrews Institute, including the duty to exercise its specialized knowledge and expertise to secure appropriate coverage and the duty to advise Andrews Institute of all material facts concerning the coverage.

120.   Andrews Institute reasonably relied on Marsh to ensure its primary and excess healthcare professional liability policies were fully integrated and the full tower of coverage was maintained from one year to the next, as well as to advise them of any potential coverage issues.

121.   Marsh knew of Mr. Floyd's claim before it placed the 2017-2018 Policies.

122.   <u>Breach:</u> If there is no coverage for Mr. Floyd's claim under the 2016-2017 Endurance Policy or under the 2017-2018 TDC Follow Form Excess Policy, then Marsh breached its fiduciary duties to Andrews Institute by failing to secure appropriate coverage to cover Mr. Floyd's claim and failing to advise Andrews Institute of the gap in coverage.

123.   <u>Damages:</u> Despite payment of premiums by Andrews Institute for $27 million in coverage, the full tower of coverage is not available to Andrews Institute. As a direct, foreseeable, and proximate result of Marsh's breach of its fiduciary obligations, Mr. Floyd suffered and continues to suffer damages.

WHEREFORE, Mr. Floyd requests judgment against Marsh for damages, including pre- and post-judgment interest, and any further relief this Court deems equitable, just, and proper.

### COUNT VIII: NEGLIGENCE AGAINST MARSH
### (PLED IN THE ALTERNATIVE TO COUNTS I & II)

124.   Mr. Floyd re-alleges Paragraphs 1 through 71.

125.   <u>Duty:</u> As Andrews Institute's broker, Marsh owed Andrews Institute a duty of care and a duty to exercise reasonable skill and diligence in procuring appropriate insurance coverage for Andrews Institute, in evaluating whether the policies placed by Marsh would cover specific claims, and in advising Andrews Institute of all material facts concerning the coverage.

126.   Andrews Institute reasonably relied on Marsh to ensure its primary and excess healthcare professional liability policies were fully integrated and the full tower of coverage was maintained from one year to the next, as well as to advise them of any potential coverage issues.

127.   Marsh knew of Mr. Floyd's claim before the 2017-2018 Policies were placed.

128.   <u>Breach:</u> If there is no coverage for Mr. Floyd's claim under the 2016-2017 Endurance Policy or under the 2017-2018 TDC Follow Form Excess Policy, then Marsh breached

its duties to Andrews Institute by negligently failing to secure appropriate coverage to cover Mr. Floyd's claim and negligently failing to advise Andrews Institute of the gap in coverage.

129.    <u>Damages:</u> Despite payment of premiums by Andrews Institute for $27 million in coverage, the full tower of coverage is not available to Andrews Institute. As a direct, foreseeable, and proximate result of Marsh's negligence, Mr. Floyd suffered and continues to suffer damages.

WHEREFORE, Mr. Floyd requests judgment against Marsh for damages, including pre- and post-judgment interest, and any further relief this Court deems equitable, just, and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Mr. Floyd demands a trial by jury on all issues so triable.

Dated: January 17, 2023

Respectfully Submitted,

VER PLOEG & MARINO, P.A.
100 S.E. Second Street, Suite 3300
Miami, FL 33131
305-577-3996
305-577-3558 *facsimile*

/s/ Stephen A. Marino, Jr.
**Stephen A. Marino, Jr., Esq.**
Florida Bar No. 79170
smarino@vpm-legal.com
smcgee@vpm-legal.com
**Kimberley P. Ver Ploeg, Esq.**
Florida Bar No. 1036957
kverploeg@vpm-legal.com
mgarcia@vpm-legal.com
*Counsel for Sharrif K. Floyd, individually and*
*as assignee of The Andrews Institute*
*Ambulatory Surgery Center, LLC*

HEISE SUAREZ MELVILLE, P.A.
2990 Ponce de Leon Blvd., Suite 300
Coral Gables, FL 33134
305-800-4476

BRAD SOHN LAW FIRM, PLLC
2990 Ponce de Leon Blvd., Suite 300
Coral Gables, FL 33134
786-708-9750
305-397-0650 *facsimile*

/s/ Brad R. Sohn
**Brad R. Sohn, Esq.**
Florida Bar No. 98788
brad@bradsohnlaw.com
paralegal@bradsohnlaw.com
*Counsel for Sharrif K. Floyd, individually and*
*as assignee of The Andrews Institute*
*Ambulatory Surgery Center, LLC*

/s/ Mark J. Heise

**Mark J. Heise, Esq.**
Florida Bar No. 771090
mheise@hsmpa.com
filings@hsmpa.com
**Luis E. Suarez, Esq.**
Florida Bar No. 390021
lsuarez@hsmpa.com
**Patricia A. Melville, Esq.**
Florida Bar No. 475467
pmelville@hsmpa.com
*Counsel for Sharrif K. Floyd, individually and*
*as assignee of The Andrews Institute*
*Ambulatory Surgery Center, LLC*